956 So.2d 808 (2007)
Kathy S. BROWN, Plaintiff-Appellant
v.
GUIDE CORPORATION, Defendant-Appellant.
No. 42,141-WCA.
Court of Appeal of Louisiana, Second Circuit.
May 9, 2007.
*809 Hudson, Potts & Bernstein L.L.P., by Brian P. Bowes, Monroe, Travis Oliver, IV, for Appellant, Guide Corporation.
Gary D. Nunn, for Appellant, Kathy S. Brown.
Before WILLIAMS, PEATROSS & MOORE, JJ.
PEATROSS, J.
In this workers' compensation case, claimant, Kathy Brown, was awarded medical benefits and mileage, but denied supplemental earnings benefits ("SEBs"), penalties and attorney fees. The employer, Guide Corporation ("Guide"), appeals and Ms. Brown answered the appeal. For the reasons stated herein, we affirm.

FACTS
Ms. Brown went to work for Guide, a headlight assembly plant in Monroe, on September 27, 2002, as an assembly line worker. According to Guide's documentation from its in-house medical clinic, Ms. Brown complained of bilateral hand, wrist, arm, shoulder and neck pain beginning on October 22, 2002, less than one month of her beginning date of employment. There were at least seven complaints made by her during the following year. According to Ms. Brown, the pain worsened over the course of the year. She was seen and evaluated by Guide's doctor, David Yarbrough, on December 18, 2003, and he ordered a nerve conduction test, which revealed bilateral carpal tunnel syndrome. Dr. Yarbrough testified that hand and wrist pain is a common complaint of employees at Guide. It was his belief that Ms. Brown needed surgery and he referred her to orthopaedics.
On March 23, 2004, Ms. Brown then sought treatment from Dr. Marilyn Ritter, an orthopaedic hand surgeon of her choosing. Dr. Ritter confirmed bilateral carpal tunnel syndrome and recommended surgery. The surgery was apparently scheduled, *810 but subsequently delayed because of Ms. Brown's sister's serious illness. According to Ms. Brown, the surgery was delayed a second time because she was advised to include all of her related ailments, in particular, her "tennis elbow," in the treatment plan. Guide's workers' compensation claims handler, Zurich Services Corp. ("Zurich"), subsequently cancelled the surgery and denied the claim on the basis that Ms. Brown's condition was not causally related to her work at Guide. Specifically, Guide asserts that, because her symptoms manifested so soon after she commenced employment, Ms. Brown is unable to prove causation.
As previously stated, Guide is a headlight assembly plant. The record indicates that there are various classifications of jobs at the plant, including some assembly line work, quality control work and inspection-type work. Some of the job tasks are classified as ergonomically stressing tasks and are on a rotation schedule so that employees perform those tasks for a maximum of two hours at a time. It is not clear from the record which tasks are so classified or exactly which tasks and how long any task was performed by Ms. Brown. Ms. Brown testified that she was performing repetitive tasks and that she was not rotated among the work stations as she should have been to prevent injury to the hands and wrists. She testified that her pain began when she was assigned to the Bat room, where she was required to lift heavy racks. There is no clear and thorough description of exactly what tasks she performed while working at Guide; however, there is testimony that she was assigned several different positions during her tenure.
Despite her complaints, Ms. Brown continued to work until she was laid off in January 2004. She collected unemployment benefits for that year; and, in January 2005, she accepted a management position at a Sally's Beauty Supply shop. Ms. Brown testified that she was contacted by Guide and offered various weekend and temporary positions and was offered a "conversion" to permanent employment in another assembly line position. According to Ms. Brown, she declined the offer for rehire because she could not perform the tasks required of the position offered. Dr. Ritter testified that Ms. Brown could not do assembly line work until after surgery and that she may have some restrictions even then.
The record indicates that Ms. Brown did clerical/typing work prior to working for Guide, but there is no evidence of complaints of hand and/or wrist pain before she began working at Guide. A former employer and friend testified that Ms. Brown had worked for him for a four- or five-year period prior to working for Guide. He could not recall any complaints of hand or wrist pain during that time. A former co-worker of Ms. Brown's testified that the two worked together briefly in 2001 hanging wallpaper and painting. She could not recall any complaints by Ms. Brown regarding hand or wrist pain.
In addition, a former co-worker of Ms. Brown's at Guide testified on her behalf. Like Ms. Brown, she described the repetitive movement required by various positions at the plant and stated that she also suffers from carpal tunnel syndrome.
Drs. Yarbrough and Ritter were questioned extensively regarding the issue of causation. Discussed in more detail infra, the doctors agreed that it is difficult to pinpoint the exact onset of carpal tunnel disease. Both doctors also testified that there are non-occupational factors that cause carpal tunnel syndrome, including gender, people with history of diabetes or rheumatoid arthritis and previous bone fractures or spurring. Dr. Yarbrough also *811 stated that chemical imbalances, hormonal imbalances and pre-existing carpal tunnel areas can cause the onset of carpal tunnel symptoms. Specifically, while he acknowledged that carpal tunnel disease is prevalent at Guide given the repetitive nature of the work performed, Dr. Yarbrough was reluctant to definitively tie Ms. Brown's carpal tunnel to her work at Guide due to the short time between her beginning employment and the time when her symptoms appeared. On the other hand, Dr. Ritter opined that it was more likely that, since Ms. Brown first began experiencing symptoms after beginning work at Guide, the carpal tunnel was a result of her job duties there.
The trial court correctly found the issue to be one of causation. The court credited Dr. Ritter's testimony on that issue, emphasizing Dr. Ritter's specialization in hand surgery and ultimately finding that Ms. Brown's carpal tunnel developed as a result of her work at Guide. The court awarded Ms. Brown medicals and mileage, but denied SEBs, penalties and attorney fees. Guide appeals the award and Ms. Brown has answered the appeal challenging the denial of SEBs, penalties and attorney fees.

DISCUSSION
Entitlement to Medical benefits, mileage and/or SEBs
Whether the claimant has carried his burden of proof and whether testimony is credible are questions of fact to be determined by the WCJ. Lewis v. Chateau D'Arbonne Nurse Care Center, 38,394 (La.App.2d Cir.4/7/04), 870 So.2d 515. Factual findings in a workers' compensation case are subject to the manifest error or clearly wrong standard of appellate review. Newsome v. Atmos Energy, 41,413 (La.App.2d Cir.8/23/06), 938 So.2d 1098; Culotta v. A.L. & W. Moore Trucking Company, 35,344 (La.App.2d Cir.3/5/03), 839 So.2d 1063, writ denied, 03-0998 (La.5/30/03), 845 So.2d 1052. When there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel its own inferences and evaluations are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989).
La. R.S. 23:1031.1(A) entitles every employee who is disabled because of the contraction of an occupational disease to receive compensation benefits, provided that the employee's illness arises out of and in the course of his employment. An occupational disease or illness is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process or employment in which the employee is exposed to such disease. La. R.S. 23:1031.1(B). This statute specifically includes "work-related carpal tunnel syndrome" in the definition of occupational disease.
La. R.S. 23:1031.1 provides, in part:
D. Any occupational disease contracted by an employee while performing work for a particular employer in which he has been engaged for less than twelve months shall be presumed not to have been contracted in the course of and arising out of such employment, provided, however, that any such occupational disease so contracted within the twelve months' limitation as set out herein shall become compensable when the occupational disease shall have been proved to have been contracted during the course of the prior twelve months' employment by a preponderance of evidence.[1]
*812 In Johnson v. Johnson Controls, Inc., 38,495 (La.App.2d Cir.5/12/04), 873 So.2d 923, this court explained application of this presumption:
In other words, where an employee worked for an employer for less than twelve months, there is a rebuttable statutory presumption that her employment did not cause her occupational disease. However, that presumption can be overcome if she proves by a preponderance of the evidence that the disease was contracted during her employment, specifically proving that there is a disability which is related to an employment-related disease, the disease was contracted during the course of employment, and the disease is a result of the work performed. Ball v. Wendy's Intern., Inc., 36,922 (La.App.2d Cir.3/5/03), 839 So.2d 1208, writ denied, 03-0978 (La.5/30/03), 845 So.2d 1056.
Here, while Ms. Brown was not diagnosed with carpal tunnel syndrome until after twelve months from her employment with Guide, the record clearly shows that Ms. Brown's symptoms manifested only weeks after her initial employment; and, therefore, Guide is entitled to the statutory presumption of lack of causation. Johnson, supra, citing Jackson v. Conagra Poultry Co., 02-492 (La.App. 3d Cir.3/5/03), 839 So.2d 1079, writ denied, 03-0986 (La.5/30/03), 845 So.2d 1054. It was, therefore, incumbent upon Ms. Brown to prove by a preponderance of the evidence that her carpal tunnel syndrome was caused by her work at Guide.
First, we note that there is no dispute that Ms. Brown suffers from bilateral carpal tunnel syndrome. Likewise, there seems to be no dispute that carpal tunnel syndrome is prevalent among the workers at Guide due to the repetitive nature of the tasks involved. Recall that a co-worker of Ms. Brown's who worked at the same stations as Ms. Brown testified and also suffers from carpal tunnel syndrome. Next, while it is true that Ms. Brown's symptomology began only weeks after her employment with Guide, there is no evidence in the record that Ms. Brown ever experienced or complained of hand and/or wrist pain or numbness prior to commencing work there. In fact, a former employer, co-worker and Ms. Brown herself testified that she never had such complaints before her employment with Guide.
Finally, while both doctors agreed that the precise onset of carpal tunnel syndrome is difficult to determine, they differed in their testimony regarding causation. Dr. Yarbrough was reluctant to specifically relate Ms. Brown's condition to her work at Guide due to the short period of time between her employment and the onset of symptoms. To the contrary, based on Ms. Brown's lack of prior history of complaints and the repetitive nature of the work performed at Guide, Dr. Ritter, a specialist in hand surgery, opined that it was more probable than not that Ms. Brown's condition developed as a result of her work at Guide.
Guide argues that Dr. Ritter's opinion should be discounted because Ms. Brown did not provide Dr. Ritter with a precise job description of the actions she was required to perform at her job. In cases such as this, however, where there is sufficient knowledge that repetitive work is being performed, we disagree. We noted in Johnson, supra:

*813 A worker is not required to relate her history to a doctor with mathematical precision and the imprecise histories given are insufficient to show manifest error when the overall tenor of [a claimant's] complaints of pain as portrayed in her medical records related the onset of symptoms to her work.
The facts of Johnson, supra, were very similar to the case sub judice. In Johnson, as here, there was no evidence of prior complaints and a rapid onset of carpal tunnel symptoms upon the claimant's commencing work. We found that, where there was "no medical evidence showing complaints of similar pain prior to [the claimant's] work for [the employer]," but where there did exist "medical evidence connecting her condition to her employment with Johnson Controls," there was no manifest error on the part of the WCJ in finding causation. We reach the same conclusion here. The WJC chose to credit the testimony of the expert in orthopedic hand surgery and accept her testimony that it was more probable than not that Ms. Brown's carpal tunnel was caused by her work at Guide. We find no manifest error in that conclusion; thus, we find no error in the award of medical benefits and mileage reimbursement.
We further find no manifest error in the WCJ's denial of SEBs. The record clearly indicates that Ms. Brown was offered and declined a position with Guide and was at no time found to be disabled. There is no evidence in the record of any medical restrictions or determinations of disability by any physician. Ms. Brown received unemployment benefits for the maximum allowable period and subsequently secured alternative employment. We will not disturb the WCJ's findings on SEBs.
Penalties and Attorney Fees
Ms. Brown argues that she is entitled to penalties and attorney fees as provided by La. R.S. 23:1201(F)[2] based on Zurich's cancellation of her surgery and denial of the claim. The determination of whether an employer should be cast with penalties and attorney fees is a question of fact for the WCJ, whose findings shall not be disturbed on appeal absent manifest *814 error. Johnson, supra, citing Taylor v. Garrett, 28,729 (La.App.2d Cir.10/30/96), 682 So.2d 831. To reasonably controvert a workers' compensation claim so as to avoid imposition of penalties and attorney fees, the employer and its insurer must provide sufficient factual and medical information to reasonably counter the evidence provided by the claimant. Id. To meet this standard, the employer must have some "valid reason or evidence upon which to base his denial of benefits." Feild v. General Motors Corp., 36,339 (La.App.2d Cir.9/18/02), 828 So.2d 150. The court must determine whether the employer "engaged in a non-frivolous legal dispute or possessed factual and/or medical information to reasonably counter the factual and medical information presented by the claimant throughout the time he refused to pay all or part of the benefits allegedly owed." Feild, supra. Penalties are stricti juris and should be imposed only when the facts clearly negate good faith and just cause in connection with the refusal to pay.
We agree with the WCJ that the "short period between claimant's commencement of employment and her symptoms provides defendant with a reasonable basis to deny her claim." Guide's denial was not frivolous and we find no evidence of a lack of good faith and just cause in its actions.

CONCLUSION
For the foregoing reasons, the judgment of the Workers' Compensation Judge awarding medical benefits and mileage, but denying supplemental earnings benefits, penalties and attorney fees is affirmed. Costs are assessed equally to Kathy S. Brown and Guide Corporation.
AFFIRMED.
NOTES
[1] Acts 2001, No. 1189, § 1, at the end of subsec. D, substituted "a preponderance" for "an overwhelming preponderance"; the amendment applies retroactively. See Johnson v. Johnson Controls, Inc., 38,495 (La. App.2d Cir.5/12/04), 873 So.2d 923, citing Davies v. Johnson Controls, Inc., 36,498 (La. App.2d Cir.10/23/02), 830 So.2d 462, writ denied, 02-2855 (La.1/31/03), 836 So.2d 70.
[2] That subsection provides as follows:

F. Failure to provide payment in accordance with this Section or failure to consent to the employee's request to select a treating physician or change physicians when such consent is required by R.S. 23:1121 shall result in the assessment of a penalty in an amount up to the greater of twelve percent of any unpaid compensation or medical benefits, or fifty dollars per calendar day for each day in which any and all compensation or medical benefits remain unpaid or such consent is withheld, together with reasonable attorney fees for each disputed claim; however, the fifty dollars per calendar day penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim. The maximum amount of penalties which may be imposed at a hearing on the merits regardless of the number of penalties which might be imposed under this Section is eight thousand dollars. An award of penalties and attorney fees at any hearing on the merits shall be res judicata as to any and all claims for which penalties may be imposed under this Section which precedes the date of the hearing. Penalties shall be assessed in the following manner:
(1) Such penalty and attorney fees shall be assessed against either the employer or the insurer, depending upon fault. No workers' compensation insurance policy shall provide that these sums shall be paid by the insurer if the workers' compensation judge determines that the penalty and attorney fees are to be paid by the employer rather than the insurer.
(2) This Subsection shall not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control.